**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NORTH CAROLINA**
**EASTERN DIVISION**

| | |
|---|---|
| **LYDIA DIANE BROCK and ROY BROCK,** | ) |
| **Plaintiffs,** | ) |
| **v.** | ) |
| **BASF CORPORATION, Individually, and as Successor In Interest to Takeda Vitamin & Food USA, Inc. f/k/a Takeda Chemical Products USA, Inc. f/k/a Wiltak, Inc.; TAKEDA AMERICA HOLDINGS, INC. f/k/a Takeda America, Inc.; TAKEDA PHARMACEUTICALS USA, INC. f/k/a Takeda Pharmaceuticals North America, Inc. f/k/a Takeda Pharmaceuticals America, Inc.; TAKEDA CHEMICAL INDUSTRIES, LTD.; and TAKEDA EUROPE GMBH; and JOHN DOES 1-40,** | ) |
| **Defendants.** | ) |

**CIVIL ACTION COMPLAINT**
**(Jury Trial Demanded)**

Plaintiffs, Lydia Diane Brock and Roy Brock, bring this Complaint against the above-listed Defendants, and allege as follows:

## INTRODUCTION

1. This case is brought by the Plaintiffs, Lydia Diane Brock ("Diane Brock" or "Mrs. Brock") and Roy Brock, alleging claims arising out of Mrs. Brock's occupational exposure to benzene and solvents containing benzene at a chemical plant located at US Highway 421, on the border of New Hanover and Pender Counties, near Wilmington, North Carolina which used

benzene to manufacture Vitamin C (the "Wilmington Plant").

2. The case was originally filed in state court in the Superior Court of New Jersey, Middlesex County, New Jersey ("New Jersey Court"), captioned as follows: Superior Court of New Jersey, Middlesex County, Law Division, No. MID-L-004607-2*3*. That case was initiated by way of a Complaint filed on August 17, 2023. The forum was chosen as New Jersey is the location of Defendant BASF Corporation's ("BASF") headquarters and BASF employed persons in New Jersey who contributed to the Wilmington Plant's safety policies and procedures and had managerial control over the Wilmington Plant's operations which involved the use of benzene. However, the case was dismissed for on grounds of *forum non conveniens* by Order dated September 25, 2025. Accordingly, the instant matter is filed.

## JURISDICTION AND VENUE

3. Subject matter jurisdiction is conferred upon this Court pursuant to 28 U.S.C. § 1332 because there is more than $75,000 at issue and complete diversity exists between the parties in that they are residents of differing states.

4. Plaintiff, Diane Brock, was exposed to benzene in North Carolina causing her injury in North Carolina. Thus, specific jurisdiction exists because this cause of action arises out of Mrs. Brock's exposures that caused injury in North Carolina.

5. Venue in this Court is proper pursuant to 28 U.S.C. § 1331 since every Defendant regularly conducts business within the Eastern District of North Carolina, and transactions and occurrences out of which the cause of action arose occurred in the Eastern District of North Carolina. Venue is also proper, in addition to other reasons averred herein, because the Plaintiffs live in the Eastern District of North Carolina.

## THE PARTIES

6. Plaintiffs Lydia Diane Brock and Roy Brock are citizens of North Carolina who live at 163 Kimwood Lane, Rocky Point, North Carolina 28457 in Pender County.

7. Defendant, BASF Corporation, Individually and as Successor-in-Interest to Takeda Vitamin & Food USA, Inc. f/k/a Takeda Chemical Products USA, Inc. f/k/a Wiltak, Inc. ("BASF") is a corporation organized in Delaware, and has a principal place of business located at 100 Park Avenue, Florham Park, New Jersey. It is therefore a citizen of New Jersey for purposes of diversity of citizenship. BASF purchased all of the stock of Takeda Vitamin & Food U.S.A., Inc. f/k/a Takeda Chemical Products USA, Inc. ("TVFU") on or about January 4, 2001. BASF subsequently merged TVFU with and into BASF and BASF survived the merger. BASF therefore succeeded to the liability of TVFU. These transactions are more fully set forth elsewhere in this Complaint.

8. Defendant, Takeda America Holdings, Inc. f/k/a Takeda America, Inc. ("TA") is a New York corporation having tis principal place of business at 555 Madison Avenue, New York, New York. TA is a citizen of the State of New York for the purposes of diversity of citizenship. TA is named as a defendant because it is a party to the Basic Agreement for the Transfer of Takeda Bulk Vitamin Business and because BASF represented to the Court in the New Jersey Court when seeking to dismiss this case for *forum non conveniens* that "Takeda" retained liability for benzene exposures at the Wilmington Plant prior to the January 4, 2001 sale of TVFU's stock by TA to BASF. To the extent that TA is determined not to have maintained liabilities for the Wilmington Plant and the Plaintiff's benzene exposures, BASF should be sanctioned for the fees and costs caused as the result of including TA in this lawsuit as the result of BASF's representations to the New Jersey Court.

9. Defendant, Takeda Chemical Industries, Ltd. ("TCI") is a Japanese corporation with a principal place of business in Osaka, Japan. TCI is named as a defendant because it is a party to the Basic Agreement for the Transfer of Takeda Bulk Vitamin Business and because BASF represented to the Court in the New Jersey Court when seeking to dismiss this case for *forum non conveniens* that "Takeda" retained liability for benzene exposures at the Wilmington Plant prior to the January 4, 2001 sale of TVFU's stock by TA to BASF. TCI is a foreign citizen for purposes of diversity of citizenship jurisdiction. To the extent that TCI is determined not to have maintained liabilities for the Wilmington Plant and the Plaintiff's benzene exposures, BASF should be sanctioned for the fees and costs caused as the result of including TCI in this lawsuit as the result of BASF's representations to the New Jersey Court.

10. Defendant, Takeda Europe GmbH ("TE") is a German corporation having its principal place of business in Hamburg, Germany. TE is named as a defendant because it is a party to the Basic Agreement for the Transfer of Takeda Bulk Vitamin Business and because BASF represented to the Court in the New Jersey Court when seeking to dismiss this case for *forum non conveniens* that "Takeda" retained liability for benzene exposures at the Wilmington Plant prior to the January 4, 2001 sale of TVFU's stock by TA to BASF. TE is a foreign citizen for purposes of diversity of citizenship jurisdiction. To the extent that TE is determined not to have maintained liabilities for the Wilmington Plant and the Plaintiff's benzene exposures, BASF should be sanctioned for the fees and costs caused as the result of including TE in this lawsuit as the result of BASF's representations to the New Jersey Court.

11. Defendant, Takeda Pharmaceuticals U.S.A., Inc., f/k/a Takeda Pharmaceuticals North America, Inc. f/k/a Takeda Pharmaceuticals America, Inc. f/k/a Wiltak, Inc. ("TUSA") is a

Delaware corporation or other business entity, with its business headquarters at 500 Kendall Street, Cambridge, MA. TUSA is named as a defendant because BASF represented to the Court in the New Jersey Court when seeking to dismiss this case for *forum non conveniens* that "Takeda" retained liability for benzene exposures at the Wilmington Plant prior to the January 4, 2001 sale of TVFU's stock by TA to BASF. TUSA is a foreign citizen for purposes of diversity of citizenship jurisdiction. TUSA is therefore a citizen of Delaware and Illinois for purposes of diversity of citizenship. To the extent that TUSA is determined not to have maintained liabilities for the Wilmington Plant and the Plaintiff's benzene exposures, BASF should be sanctioned for the fees and costs caused as the result of including TUSA in this lawsuit as the result of BASF's representations to the New Jersey Court.

12. Defendants, John Does 1 through 40, are each corporations, limited liability companies, partnerships, limited partnerships, or other business entities, or individuals, who may have been culpably involved in the underlying facts and whose identities may be ascertained in discovery, *see* N.C.G.S. § 1-166, including ones 1) who manufactured, marketed, sold and distributed benzene or benzene-containing products used at the Wilmington Plant between 1993 and 2001; and/or 2) provided occupational health and safety services to the Wilmington Plant during said time period; and/or 3) owned, operated, controlled or succeeded to the liabilities of the Wilmington Plant related to some or all of the pertinent times. These Defendants' true names and identities are not yet known to the Plaintiffs despite due diligence which has consisted of speaking with witnesses, searching publicly available sources and requesting answers to interrogatories and documents from Defendants BASF and TUSA.

## FACTS COMMON TO ALL COUNTS

13. Defendant TVFU operated the Wilmington Plant from a date prior to Plaintiff's first employment at the Wilmington Plant until January 4, 2001 when Defendant BASF purchased TVFU's stock, and with TVFU's stock, acquired the Wilmington Plant and continued the Wilmington Plant's operations.

14. Defendant TVFU's stock was owned by Defendant TA.

15. On or about June 6 – 7, 2000 BASF, BASF Aktiengesellschaft and BASF Handels-Und Expert-GmbH on the one hand and TCI, TA and TE on the other hand, entered into a Basic Agreement for the Transfer of Takeda Bulk Vitamin Business ("BASF-TA Acquisition Agreement").

16. Pursuant to Chapter 2, Section 2.1 and Chapter 4, Sub-Chapter 1 of the BASF-TA Acquisition Agreement, BASF agreed to and did purchase from TA all of the stock of TVFU, BASF Handels-Und Expert-GmbH agreed to and did purchase from TCI all of the stock of TE and BASF agreed to and did purchase from TCI all of the stock of Takeda Vitamin & Food Asia.

17. BASF's acquisition of TVFU became effective on January 4, 2001.

18. On the same date, January 4, 2001, a Plan of Merger was executed and Articles of Merger were filed with the North Carolina Department of the Secretary of State, through which TVFU was merged into BASF and BASF was made the survivor of the merger.

19. Nothing in the BASF-TA Acquisition Agreement states that TA, TE, TUSA or any other Takeda entity retained any liabilities for TVFU. At most, TA agreed to indemnify BASF for the costs of remediation of ground water contamination if certain conditions were met and TA did not itself pay those costs.

20. Nonetheless, BASF in the prior New Jersey proceedings represented that this case should be transferred to North Carolina because BASF represented that "Takeda" retained liability for Mrs. Brock's exposures and because this Court, but not the New Jersey Court, had jurisdiction over the "Takeda" entities making this Court an appropriate forum so that there would be jurisdiction over "Takeda" entities despite BASF's purchase of TVFU's stock which traditionally results in an acquisition of TVFU's liability.

21. The Wilmington Plant used benzene in the production of Vitamin C.

22. BASF continued to use benzene in the production of Vitamin C at the Wilmington Plant after it acquired TVFU and continued to operate the plant.

23. Records produced by BASF confirm that it continued to provide annual benzene training to BASF employees at the Wilmington Plant through at least August 2001 and therefore continued to use benzene at the Wilmington Plant through at least August 2001. BASF has withheld production of over 1,000 banker's boxes of documents which it claims has records of the Wilmington Plant. Plaintiffs therefore do not have complete information on when benzene was last used at the Wilmington Plant after August 2001.

24. It was the decision of BASF, and its predecessor TVFU, to use benzene in the production of Vitamin C.

25. BASF, and its predecessor TVFU, used the benzene to manufacture Vitamin C.

26. BASF, and its predecessor TVFU, purchased the benzene for use at the Wilmington Plant.

27. BASF, and its predecessor TVFU, determined the processes and procedures for using benzene to manufacture Vitamin C, and implemented those processes and procedures.

28. BASF, and its predecessor TVFU, were responsible for compliance with the Occupational Safety and Health Administration ("OSHA") benzene standard at the Wilmington Plant.

29. BASF, and its predecessor TVFU, were responsible for maintaining and operating the process equipment in which benzene was used to manufacture Vitamin C, and for doing so in a manner that prevented benzene's release into the workplace environment where workers, including Mrs. Brock would be and were exposed to the benzene.

30. BASF, and its predecessor TVFU, permitted and caused benzene to be released into the air of the Wilmington Plant which in turn caused Mrs. Brock to be exposed to the benzene, all of which violated the OSHA benzene standard, basic industrial hygiene and occupational health and safety best practices, the hierarchy of safety controls and otherwise breached their duty to the Plaintiff.

31. Mrs. Brock was employed by Fluor Daniel, an independent contractor at the Wilmington Plant.

32. Mrs. Brock's employment file produced by Fluor Daniel through its in-house counsel in Texas states that Mrs. Brock was hired by Fluor Daniel on March 15, 1993 and separated from Fluor Daniel on November 16, 2001.

33. BASF told the Superior Court of New Jersey, Middlesex County that it has a breach of contract claim against Fluor Daniel in its motion to dismiss for *forum non conveniens* and that the case should be transferred to North Carolina so that BASF could pursue a breach of contract claim against Fluor Daniel.

34. It was only after the Plaintiffs advised the New Jersey Court that BASF did not

produce any contract with Fluor Daniel that BASF was pressed by the Court to admit that it was not in possession of any contract with Fluor Daniel and had not read the terms of any alleged contract with Fluor Daniel, and therefore was not able to state that it actually had a basis for a breach of contract action that it represented was necessary to file against Fluor Daniel in North Carolina. BASF did not state whether any contract with Fluor Daniel contained a forum selection clause. The New Jersey Court already prepared its written decision that it read into the record before the falsity of BASF's representations were exposed.

35. Similarly, BASF represented to the New Jersey Court that it intended to file breach of contract actions against its benzene suppliers, and that North Carolina was the appropriate forum because North Carolina would have jurisdiction over the benzene suppliers. Yet, BASF conceded in response to the New Jersey Court's questions that it had not located any contracts with benzene suppliers, and that it did not known who the benzene suppliers were. BASF therefore could not have determined that it has a basis for filing a breach of contact action against any benzene supplier. The New Jersey Court already prepared its written decision that it read into the record before the falsity of BASF's representations were exposed.

36. Benzene is a known human carcinogen. Benzene exposure causes multiple forms of cancer and blood diseases, including Acute Myeloid Leukemia, Myelodysplastic Syndrome, Multiple Myeloma, Non-Hodgkin's Lymphoma, Bladder Cancer, Lung Cancer, Aplastic Anemia, pancytopenia, anemia, thrombocytopenia, leukopenia and other blood dyscrasias.

37. As a condition of her employment, and due to BASF and its predecessor TVFU's wrongful conduct, Mrs. Brock was directly and indirectly exposed to benzene at the Wilmington Plant on a regular, frequent and proximate basis.

38. Upon information and belief, BASF supplied benzene to the Wilmington Plant prior to and after acquiring the Wilmington Plant. BASF's website or server address is written on benzene MSDS dated October 11, 1984 and revised December 1, 2000 which, upon information and belief, was sourced from the Wilmington Plant. See, Flour00071 – 78.

39. Mrs. Brock was exposed to benzene, and to the vapors, aerosols, mists and fogs from benzene, by means of inhalation and dermal absorption (from direct dermal contact with said products, dermal contact with clothes contaminated by said products and/or dermal contact with benzene vapors in the air).

40. As a direct and proximate result of her exposure to benzene at the Wilmington Plant and due to BASF and its predecessor TVFU's wrongful conduct, Mrs. Brock was caused to contract Acute Myeloid Leukemia ("AML"), which she was diagnosed with on or after October 2, 2022. Plaintiff did not learn of a connection between her AML and exposure to benzene until a later date.

41. Mrs. Brock has suffered multiple painful and debilitating symptoms and side effects of her AML and medical treatments necessitated by the AML. Mr. Brock underwent multiple rounds of chemotherapy, a stem cell transplant, multiple bone marrow biopsies, immunosuppressive therapies, use of steroids, compromised immunity, insertion of port catheters and other surgical procedures.

42. The treatments provided to Mrs. Brock place her at risk for developing other cancers, liver toxicity, kidney damage, osteonecrosis and other painful, debilitating and life-threatening conditions.

43. Plaintiff is informed through investigation that Myelodysplastic Syndrome

("MDS") and AML are diagnoses that occur at different stages of the progression of the same myeloid malignancy.

44. At all times material hereto, Defendants acted through their agents, ostensible agents, servants or employees, who were acting within the scope of their employment on the business of the Defendants.

45. The Defendants' agents and ostensible agents included their employees and other persons and entities, since the Defendants are all corporations that must act through their employees and others that the Plaintiffs are not able to identify by name without conducting discovery.

46. BASF during the pertinent times was a manufacturer and/or seller of benzene.

**COUNT I – NEGLIGENCE**

47. Plaintiffs hereby adopt and incorporate by reference each and every statement and averment contained in each of the foregoing paragraphs, as if each of said paragraphs were set forth herein with particularity.

48. Plaintiff Mrs. Brock worked with, around and in close proximity to, handled, inhaled, dermally absorbed, ingested and was otherwise directly and indirectly exposed to benzene, benzene-containing solvents and the vapors therefrom during her employment at the Wilmington Plant and while on its premises.

49. Defendants, including but not limited to BASF, and its predecessor TVFU, knew, or in the exercise of reasonable care, could and/or should have known that persons such as Plaintiff was required to work around and in close proximity to, inhale, dermally absorb, ingest and was otherwise directly and indirectly be exposed to benzene, benzene-containing solvents and/or

vapors therefrom on the Wilmington Plant.

50. Defendants knew, should and/or reasonably could have known that exposure to benzene causes blood and bone marrow poisoning and damage, damage to DNA, chromosome damage, cancer, leukemia and other blood and bone marrow disease and damage, and is otherwise extremely dangerous to human health.

51. Defendants knew, should and/or reasonably could have known that exposure to benzene is carcinogenic, leukemogenic, inherently defective, ultra-hazardous, dangerous, deleterious, poisonous and otherwise highly harmful to the body and health of Plaintiff and persons similarly situated.

52. Plaintiff, and similarly situated persons did not and could not know of the nature and extent of the danger to their bodies and health, including the risk for cancer and leukemia, caused by exposure to benzene, benzene-containing solvents and/or vapors therefrom.

53. Defendants, including but not limited to BASF, and its predecessor TVFU, knew, should and/or reasonably could have known that Plaintiff, her employer and other persons similarly situated, would come into direct and indirect contact with, handle, inhale, ingest, dermally absorb and otherwise be exposed to benzene during their ordinary and foreseeable at the Wilmington Plant.

54. Defendants, including but not limited to BASF, and its predecessor TVFU, knew, should and/or reasonably could have known that the Plaintiff, her employer and other persons similarly situated did not know, understand or fully appreciate the nature and extent of the danger to their bodies and health, including the risk for cancer and leukemia, caused by exposure to benzene, benzene-containing solvents and/or the vapors therefrom at the Wilmington Plant.

55. Defendants during pertinent times had a duty to all invitees, workers and employers at the Wilmington Plant as well as to the community surrounding the Wilmington Plant, to exercise reasonable care in the storage, use and disposal of benzene so that their operations at the Wilmington Plant did not pose a risk of injury, harm, disease and death, including cancer and leukemia.

56. Defendants had a duty to comply with OSHA benzene regulations, which included requirements to perform air monitoring, biological monitoring, provide medical examinations, implement engineering controls and work practices to protect against benzene exposure, require the use of appropriate respiratory protection if engineering controls and work practices could not reduce or maintain benzene concentrations below certain levels, implement programs to protect workers against benzene exposure, provide appropriate respiratory protection for the concentration of benzene in the air, implement a respiratory protection program, require the use of personal protective clothing an equipment to prevent skin contact with liquid benzene and benzene vapors, post signs identifying the presence of benzene, that respirator use is mandatory and that there is a cancer hazard, provide material safety data sheets for benzene and provide training on benzene's hazards and how to protect against benzene exposure.

57. Defendants had a duty to comply with OSHA process safety management regulations.

58. Defendants had a duty to implement standard industrial hygiene and occupational health and safety procedures, including the hierarchy of safety controls which provides that the safest method of controlling a hazard is to replace a hazardous substance with a safer one, and if that is not possible to use engineering controls such as closed systems and local exhaust ventilation

to prevent exposures, and if that is not possible then to implement administrative controls through warnings and personal protective equipment but only as the last resort because such controls are prone to failure.

59. In this regard, Defendants including BASF, and its predecessor TVFU, should have eliminated the use of benzene through the use of an alternative chemical or purchase of crystalline Vitamin C. If that was no possible, BASF, and its predecessor TVFU, should have used properly maintained process equipment which kept benzene inside of a closed system and prevented benzene's release, along with local exhaust ventilation to remove benzene vapors before they migrated and reached workers' breathing zones. BASF should have required the use of the appropriate forms of respiratory protection for benzene air concentrations that it determined through the use of air monitoring devices, or appropriate respiratory protection for unknown concentrations of benzene in the air.

60. Defendants including BASF should have used appropriately positioned fixed point air monitors, hand-held air monitors and photoionization detectors as well as personal air monitoring devices in order the determine the release of benzene and concentration of benzene in the air.

61. Defendants including BASF, and its predecessor TVFU, had a duty to comply with North Carolina occupational safety and health regulations intended to protect workers from exposure to chemicals and benzene in particular.

62. Defendants had a duty to maintain all tanks, pipes, reactors, valves, pumps and other process equipment so as to prevent benzene from being released into the workplace air and the environmental air of the community surrounding the Wilmington Plant.

63. Defendants had a duty to comply with U.S. EPA regulations including the National Emissions Standards for Hazardous Air Pollutants ("NESHAP") and North Carolina environmental regulations intended to prevent the release of benzene and its vapors from process equipment.

64. Defendants breached their duty and were negligent and grossly negligent because, knowing all of the above, they:

a. Used benzene when safer alternative chemicals and manufacturing processes were available;

b. Used benzene when they could have instead purchased crystalized Vitamin C;

c. Did not use appropriate process equipment that maintained benzene inside of a closed system so as to prevent its release and worker and community exposure to benzene;

d. Did not properly maintain its process equipment permitting the release of benzene into the workplace and environmental air of the surrounding community;

e. Did not use proper local exhaust ventilation to capture benzene vapors that were released before they migrated and worker breathing zones and the environmental air of the surrounding community;

f. Did not properly maintain any local exhaust ventilation such that it was not effective in capturing benzene vapors when they were released;

g. Did not properly inspect the process equipment and premises for conditions leading to the release of benzene or inspect the process equipment and premises for the release of benzene;

h. Did not use appropriate air monitoring devices to detect the release of benzene and measure the concentrations of benzene in the air;

i. Did not require the use of appropriate forms of respiratory protection for the concentrations of benzene in the air;

j. Did not require the use of appropriate forms of protective clothing and equipment to prevent benzene exposure;

k. Did not provide shower and changing facilities or mandate their use and changing out of contaminated clothing and into clean clothing at the end of each shift;

l. Did not provide appropriate biological monitoring and medical examinations;

m. Permitted workers to be exposed to benzene;

n. Permitted workers to be exposed to benzene above the National Institute of Occupational Safety and Health Administration's ("NIOSH") Recommended Exposure Limits ("REL"), the American Conference of Governmental Industrial Hygienists ("ACGIH") Threshold Limit Values ("TLV"), the OSHA Permissible Exposure Limit and the European Union's recommended exposure limits for benzene;

o. Failed to post signs warning of the presence of benzene, that there was a cancer hazard and that respiratory protection was required;

p. Failed to warn and train workers about the hazards of benzene exposure and how to prevent exposures, and failed to assure that workers were properly trained and warned;

q. Failed to properly supervise workers to assure that procedures were followed to prevent the release of benzene;

r. Failed to properly supervise workers to assure that appropriate respiratory equipment, protective clothing, gloves and other protective equipment were used;

s. Failed to comply with the OSHA benzene standard;

t. Negligently hired contractors;

u. Failed to take precautions to warn and/or adequately warn Plaintiff and her employer as to the location of benzene on the site, the full scope of benzene's hazards and the full scope of work practices and protective equipment to prevent benzene exposure;

v. Caused and permitted a workplace culture that was unsafe and did not fully appreciate and respect the hazards of benzene exposure;

w. Failed to take precautions to warn and/or adequately warn Plaintiff and her employer of the dangers to their health, including the nature and extent thereof, caused by exposure to benzene;

x. Failed to take precautions to warn or adequately warn Plaintiff and her employer of the reasonably safe, sufficient and necessary safeguards, protective equipment, wearing apparel, appliances and engineering controls to protect them from exposure to benzene and physical harm, including leukemia, caused by working with and around the benzene products;

y. Failed and omitted to place any warnings or notices, or adequate and sufficient warnings and notices, on the premises and process equipment regarding the known or potential risks, dangers and harm of benzene exposure, including contracting lymphohematopoietic disease, and the precautions necessary for use on the premises to protect against the risk of dangers to health;

z. Failed and omitted to take all reasonable, necessary, proper and prudent measures to assure that all necessary warnings, notices and instructions as to the products' benzene content, leukemogenic, carcinogenic, deleterious, poisonous and dangerous nature, and the reasonable and necessary safe guards and procedures reached the Plaintiff and her employer, and were complied by all persons on the premises;

aa. Did not maintain on site at the Wilmington Plaint occupational health and safety personal, including industrial hygienists and occupational medicine physicians to as to properly supervise workers and control their exposures to benzene;

bb. BASF, and its predecessor TVFU, knew, should and/or could have known that the failure to warn and/or adequately warn of the risks, dangers and harm created by exposure to the benzene, and the failure to implement the reasonably safe and sufficient precautions, practices, personal protective equipment, wearing apparel, appliances and engineering controls on the premises, would act as an inducement to Plaintiff and other end users similarly situated to come into direct and indirect contact with, handle, inhale, dermally absorb and otherwise be exposed to benzene and/or vapors therefrom, without proper and adequate protection;

cc. BASF, and its predecessor TVFU, failed to train and advise the Plaintiff and her employers of how to adopt and implement a safe, sufficient and proper plan and method to safely work with and around benzene, resulting in the creation of an atmosphere that the workers were led to believe that the premise was relatively safe to work on and that it was relatively safe to work with and around, handle, come in direct and indirect contact with, inhale, ingest, dermally absorb and otherwise be exposed to benzene;

dd. Failed to comply with all federal, state, local and trade statutes, codes, regulations and ordinances relating to the benzene content of their products, actions required to determine and analyze the hazardous nature of their products and the warnings and instructions accompanying same, including but not limited to 29 CFR 1910.1200; 29 CFR 1910.1028;

ee. Failed to test the adequacy of labels, warnings and instructions at the premises;

ff. Failed to assure that Plaintiff and her employer fully appreciate the hazards of the premises and how to be protected from benzene exposure before they performed

any work on the premises;

gg. Failed to take all reasonable, necessary, proper and prudent measures to make their premises safe; and,

hh. For these reasons, Defendant failed to act in a reasonably prudent manner and grossly deviated from the ordinary standard of care.

65. As the direct and proximate result of Defendants' including but not limited to BASF's, and its predecessor TVFU's, acts and omissions, Plaintiff Mrs. Brock contracted and suffers from AML, and multiple side effects, conditions, illnesses and symptoms caused by AML and the medical treatments necessitated thereby, which caused him pain, suffering, disability, disfigurement, deformity, impairment, mental anguish, anxiety, humiliation, and increased susceptibility to infection.

66. As the direct and proximate result of Defendants' acts and omissions, Plaintiff was prevented from engaging in those activities from which she derives life's pleasures.

67. As the direct and proximate result of Defendants' acts and omissions, Plaintiff has in the past, continues to and in the future will suffer other economic losses.

68. As the direct and proximate result of Defendants' acts and omissions, Plaintiff was required and continued to be required to spend various sums of money for medical treatments, hospitalizations and medicines, to treat Plaintiff's disease and injuries, and the sequalae therefrom, and has incurred additional economic expenses and losses, which expenses and losses may continue to accrue.

69. Wherefore, Plaintiffs pray for judgment from Defendants, individually, jointly and severally, in an amount in excess of seventy-five thousand dollars ($75,000.00), together with such other and further relief as this Court deems just and appropriate, under the circumstances, including

punitive damages, costs, interest, and delay damages.

**COUNT II - BREACH OF WARRANTY**

70. Plaintiffs hereby adopt and incorporate by reference each and every statement and averment contained in each of the foregoing paragraphs, as if each of said paragraphs were set forth herein with particularity.

71. Defendants, individually, jointly and severally expressly and/or impliedly warranted, including to Plaintiff and other end users of their benzene and benzene-containing solvents who were similarly situated, that the benzene and benzene-containing solvents, were merchantable, reasonably fit and safe for their intended, stated and described purpose and application, when in fact they were not.

72. Defendants, individually, jointly and severally breached said warranties to Plaintiff, in that their benzene and benzene-containing solvents were inherently defective, ultra hazardous, dangerous, deleterious, poisonous, carcinogenic, unfit for use, not properly merchantable and not safe, as marketed, for their foreseeable use and purpose, in that they contained benzene and caused lymphohematopoietic diseases, including AML, were defectively designed and lacked warnings, instructions and training, or adequate and sufficient warnings, instructions and training, as more fully set forth hereinabove, and including because:

a. The products contained benzene and benzene causes cancer, leukemia and other harm to the blood and bone marrow of humans;

b. The products lacked all elements necessary to make them safe for their intended and foreseeable use;

c. The Defendants failed to take precautions to warn and/or adequately warn Plaintiff and her employers that their benzene-containing solvents contained benzene;

d. The products lacked warnings and instructions, and or adequate warnings and

instructions, of the dangers to human health, including the nature and extent thereof, caused by exposure to benzene and the benzene-containing solvents, including the risk for contracting cancer, leukemia and other blood and bone marrow disease;

e. The Defendants did not warn or adequately warn Plaintiff and her employer of the reasonably safe, sufficient and necessary safeguards, protective equipment, wearing apparel, appliances and engineering controls to protect them from exposure to benzene and physical harm, including leukemia, caused by working with and around the benzene and benzene-containing solvents;

f. There were no warnings or notices, or adequate and sufficient warnings and notices, on the containers in which the benzene and benzene-containing solvents were sold, contained, delivered and used in conjunction with, or shipping and billing documents, regarding the known or potential risks, dangers and harm therefrom, including contracting lymphohematopoietic disease, and the precautions necessary for use with the benzene and benzene-containing solvents to protect against the risk of dangers to health;

g. Defendants failed to train and advise, or adequately train and advise, the Plaintiff and her employers of how to adopt and implement a safe, sufficient and proper plan and method to safely handle and use their benzene and benzene-containing solvents, resulting in the creation of an atmosphere that the Defendants' benzene and benzene-containing solvents were relatively safe to work with and around, handle, come in direct and indirect contact with, inhale, ingest, dermally absorb and otherwise be exposed to;

h. Defendants failed to train, communicate, publish, adopt and enforce a safety plan and a safe method of handling and working with their benzene and benzene-containing solvents;

i. They failed to recommend methods to improve the work environment;

j. The Defendants failed to develop alternative products, including products which did not contain benzene;

k. The Defendants failed to assure that warnings, instructions, advisements, and training reached Plaintiff, Plaintiff's employer, and other end users similarly situated, such that Plaintiff and other end users were adequately warned and protected, against the hazards posed by benzene and benzene-containing solvents;

l. The ordinary and foreseeable use of the Defendants' benzene and benzene-containing solvents, or those benzene and benzene-containing solvents of Defendants which were distributed to the Wilmington Plant, is an intrinsically dangerous and ultra-hazardous activity;

m. The Defendants' benzene and benzene-containing solvents were also defectively designed in that their hazards outweighed the benefit, if any, of the products' benzene content;

n. The Defendants' benzene and benzene-containing solvents were defective in that they failed to meet their consumer's expectations for safety;

o. The Defendants' benzene and benzene-containing solvents were packaged in a manner that increased the risk for exposure to benzene and increased the amount of benzene exposure end users sustained;

p. The Defendants' benzene and benzene-containing solvents contained directions for use that increased the risk for exposure to benzene and increased the amount of benzene exposure end users sustained;

q. The Defendants to manufacture and sell benzene and products containing benzene despite full knowledge that there were safer alternative products; and,

r. The Defendants continued to manufacture and sell benzene and benzene-containing solvents despite actually manufacturing and selling products that did not contain benzene which were used for the same purposes as their benzene and benzene-containing solvents and which were equally effective;

s. Benzene, including the cumulative effects of benzene exposure, is known to cause genetic damage, blood and bone marrow diseases and cancers including AML, MDS, non-Hodgkin's lymphoma, Multiple Myeloma, Chronic Lymphocytic Leukemia, Acute Lymphocytic Leukemia and Aplastic Anemia;

t. The medical and scientific community recommended that safer solvents be used in place of benzene since as early as the 1920's and the federal government has declared that there is no safe level of exposure to benzene, that products containing benzene are unreasonably dangerous and that no warnings are adequate to protect against the hazards of benzene in consumer products.

73. Defendants' warranties were made both orally and in writing, and Plaintiff is no longer in possession of the written materials upon which such warranties were made.

74. As the direct and proximate result of the Defendants' acts and omissions, Plaintiff contracted and suffers from AML, and multiple side effects, conditions, illnesses and symptoms caused by AML and the medical treatments necessitated thereby, which cause him pain, suffering,

disability, disfigurement, deformity, impairment, mental anguish, anxiety, humiliation, and increased susceptibility to infection.

75. As the direct and proximate result of the Defendants' acts and omissions, Plaintiff is prevented from engaging in those activities from which she derives life's pleasures.

76. As the direct and proximate result of the Defendants' acts and omissions, Plaintiff has in the past, continues to and in the future will suffer other economic losses.

77. As the direct and proximate result of the Defendants' acts and omissions, Plaintiff was required to and will continue to spend various sums of money for medical treatments, hospitalizations and medicines, to treat Plaintiff's disease and injuries and the sequela therefrom, which expenses may continue to accrue, and has incurred additional economic expenses and losses, which expenses and losses may continue to accrue.

78. Wherefore, for all of the foregoing reasons, Plaintiffs pray for judgment from Defendants, individually, jointly and severally in an amount in excess of seventy-five thousand dollars ($75,000.00), together with such other and further relief as this Court deems just and appropriate, under the circumstances, including punitive damages, costs, interest, and delay damages.

## COUNT III – FAILURE TO WARN AND DEFECTIVE DESIGN

79. Plaintiffs hereby adopt and incorporate by reference each and every statement and averment contained in each of the foregoing paragraphs, as if each of said paragraphs were set forth herein with particularity.

80. Plaintiff Mrs. Brock is a Claimant under N.C.G.S. § 99B-1, and the relevant Defendants are manufacturers and/or sellers under N.C.G.S. § 99B-1 and were, at all times material

hereto, in the business of manufacturing, refining, designing, producing, processing, compounding, converting, packaging, selling, distributing, marketing, re-labeling, supplying and/or otherwise placing into the stream of commerce benzene and benzene-containing solvents and products.

81. Pursuant to N.C.G.S. § 99B-5, the Defendant manufacturers and sellers herein acted unreasonably in failing to provide such warning or instruction, and their failure to provide adequate warning or instruction was a proximate cause of the harm for which damages are sought.

82. Pursuant to N.C.G.S. § 99B-5, at the time the product left the control of the manufacturer or seller, the product, without an adequate warning or instruction, created an unreasonably dangerous condition that the manufacturer or seller knew, or in the exercise of ordinary care should have known, posed a substantial risk of harm to a reasonably foreseeable claimant. In the alternative, after the product left the control of the manufacturer or seller, the Defendants as manufacturers or sellers became aware of or in the exercise of ordinary care should have known that the product posed a substantial risk of harm to a reasonably foreseeable user or consumer. However, Defendants failed to take reasonable steps to give adequate warning or instruction or to take other reasonable action under the circumstances.

83. The benzene and benzene-containing solvents were expected to and did reach the Wilmington Plant, the Plaintiff and her employer without substantial change in the condition in which they were sold.

84. The benzene and benzene-containing solvents were defective when they left the Defendants' possession, custody and control.

85. Workers at the Wilmington Plant were the intended and foreseeable users of the

Defendants' benzene and benzene-containing solvents, and it was intended by and foreseeable to the Defendants that the benzene and benzene-containing solvents would be used in the manner that they were used in at the Wilmington Plant.

86. The Defendants' benzene and benzene-containing solvents were defective and Defendants acted negligently with regard to their failure to warn with regard to the products at issue insofar as the they lacked adequate warnings and the products contained benzene which is known to cause cancer, leukemia and other harm to the blood and bone marrow of humans.

87. During the pertinent times, Defendants failed to take precautions to warn and/or adequately warn Plaintiff and her employer that their benzene-containing solvents contained benzene. They did not warn or adequately warn Plaintiff and here employer of the reasonably safe, sufficient and necessary safeguards, protective equipment, wearing apparel, appliances and engineering controls to protect them from exposure to benzene and physical harm, including leukemia, caused by working with and around the benzene and benzene-containing solvents. There were no warnings or notices, or adequate and sufficient warnings and notices, on the containers in which the benzene and benzene-containing solvents were sold, contained, delivered and used in conjunction with, or shipping and billing documents, regarding the known or potential risks, dangers and harm therefrom, including contracting lymphohematopoietic disease, and the precautions necessary for use with the benzene and benzene-containing solvents to protect against the risk of dangers to health.

88. During the pertinent times, Defendants failed adequately to train and advise, or adequately train and advise, the Plaintiff and her employer of how to adopt and implement a safe, sufficient and proper plan and method to safely handle and use their benzene and benzene-

containing solvents, resulting in the creation of an atmosphere that the benzene and benzene-containing solvents were relatively safe to work with and around, handle, come in direct and indirect contact with, inhale, ingest, dermally absorb and otherwise be exposed to; failed to train, communicate, publish, adopt and enforce a safety plan and a safe method of handling and working with their benzene and benzene-containing solvents; and failed to develop alternative products, including products which did not contain benzene.

89. Under N.C.G.S. § 99B-6, Plaintiff shows that with regard to the manufacturer Defendants, at the time of its manufacture the manufacturer acted unreasonably in designing or formulating the product, that this conduct was a proximate cause of the harm for which damages are sought, and in addition a) At the time the product left the control of the manufacturer, the manufacturer unreasonably failed to adopt a safer, practical, feasible, and otherwise reasonable alternative design or formulation that could then have been reasonably adopted and that would have prevented or substantially reduced the risk of harm without substantially impairing the usefulness, practicality, or desirability of the product; or b) At the time the product left the control of the manufacturer, the design or formulation of the product was so unreasonable that a reasonable person, aware of the relevant facts, would not use or consume a product of this design.

90. As the direct and proximate result of the Defendants' negligence, negligent failure to warn and negligent design, and related acts and omissions, Plaintiff contracted and suffers from AML, and multiple side effects, conditions, illnesses and symptoms caused by AML and the medical treatments necessitated thereby, which cause her pain, suffering, disability, disfigurement, deformity, impairment, mental anguish, anxiety, humiliation, and increased susceptibility to infection.

91. As the direct and proximate result of the Defendants' acts and omissions, Plaintiff was and is prevented from engaging in those activities from which she derives life's pleasures.

92. As the direct and proximate result of the Defendants' acts and omissions, Plaintiff has in the past, continues to and in the future will suffer economic losses.

93. As the direct and proximate result of the Defendants' acts and omissions, Plaintiff was, and in the future will be, required to spend various sums of money for medical treatments, hospitalizations and medicines, to treat Plaintiff's disease and injuries and the sequela therefrom, and has incurred additional economic expenses and losses, which expenses and losses may continue to accrue.

94. Wherefore, for all of the foregoing reasons, Plaintiffs pray for judgment from Defendants, individually, jointly and severally in an amount in excess of seventy-five thousand dollars ($75,000.00), together with such other and further relief as this Court deems just and appropriate, under the circumstances, including punitive damages, costs, interest, and delay damages.

**COUNT IV -- INTENTIONAL TORT – BATTERY & FRAUD**

95. Plaintiffs hereby adopt and incorporate by reference each and every statement and averment contained in each of the foregoing paragraphs, as if each of said paragraphs were set forth herein with particularity.

96. Defendants committed the intentional tort of battery by causing the Plaintiff's exposure to benzene knowing that those exposures would cause harm to the Plaintiff.

97. Defendants knew, foresaw and intended that their benzene and benzene-containing solvents were used in the manner in which the benzene and benzene-containing solvents were

used at the Wilmington Plant, and that benzene and benzene-containing solvents would be released into the atmosphere while using the benzene and benzene-containing solvents, and Plaintiff and others similarly situated would work with, inhale, ingest, dermally absorb, handle or directly and indirectly come into contact with, and/or otherwise be exposed to benzene, which created a hazardous and unsafe condition and risk to the health of Plaintiff and others similarly situated.

98. Defendants knew that their benzene and benzene-containing solvents were inherently defective, ultra-hazardous, dangerous, deleterious, poisonous, carcinogenic, leukemogenic and otherwise highly harmful to the Plaintiff and persons similarly situated.

99. Defendants knew that their benzene-containing solvents contained benzene.

100. Defendants knew that end users, such as the Plaintiff would work around, and be exposed to benzene as the result of the use of the Defendants' benzene and benzene-containing solvents.

101. Defendants knew, through information in their possession and control, and other information so obvious to them so as to be imputed to them, that benzene was capable of causing leukemia and other blood and bone marrow disorders, including AML.

102. Defendants knew, through information in their possession and control, and other information so obvious to them so as to be imputed to them, that there is no safe level of exposure to benzene.

103. Defendants were capable of manufacturing, producing and processing the identified products in a manner that eliminated or significantly reduced their benzene content.

104. Defendants knew, through information in their possession and control, and other information so obvious to them so as to be imputed to them, that their benzene and benzene-

containing solvents placed the Plaintiff, and other end users similarly situated, at a significantly increased risk for contracting aplastic anemia, cancer, leukemia and other blood and bone marrow disorders, including MDS and AML, as a direct and proximate result of exposure to the benzene and benzene-containing solvents.

105. Defendants knew that Plaintiff, her employers and coworkers, and other end users similarly situated, did not know of or appreciate that benzene and benzene-containing solvents were capable of causing cancer, leukemia and other blood and bone marrow disorders, including MDS and AML.

106. Defendants knew that Plaintiff, her employers and coworkers, and other end users similarly situated, did not know of the proper and necessary personal protective equipment, appliances, wearing apparel, engineering controls, procedures and practices for use in conjunction with the benzene and benzene-containing solvents to prevent or minimize benzene exposure and the risk for contracting cancer, leukemia and other blood and bone marrow disorders, including MDS and AML.

107. Defendants knew that their failure to warn, instruct, train and advise the Plaintiff, her employer and coworkers of there benzene exposures and benzene's capability of causing cancer, leukemia and other blood and bone marrow disorders, including MDS and AML, would act as, and did in fact act as, an inducement for the Plaintiff to continually expose herself to benzene without necessary and proper personal protective equipment, practices and procedures in order to reduce or eliminate benzene exposure and leukemia risk.

108. Defendants knew that their failures, by intent and omission, to warn, instruct, train and advise the Plaintiff, her employer and coworkers of the benzene exposures and benzene's

capability of causing cancer, leukemia and other blood and bone marrow disorders, including MDS and AML, would act as, and did in fact act as, an inducement for the Plaintiff to unknowingly and continually expose himself to benzene and place himself at risk for contracting leukemia.

109. Defendants knew that their failures to warn, instruct and train the Plaintiff, her employer and coworkers of the proper and necessary personal protective equipment, work practices and procedure to avoid benzene exposure and the risk of contracting cancer, leukemia and other blood and bone marrow disorders, including MDS and AML, would act as, and did in fact act as, an inducement for the Plaintiff to unknowingly and continually expose herself to benzene and place herself at risk for contracting leukemia, through the use of their identified products without proper and necessary personal protective equipment, work practices and procedures.

110. Defendants knew that their failures, by intent and omission, to warn, instruct and train the Plaintiff, her employers and coworkers would cause Plaintiff to aggravate here condition and situation, by preventing her from avoiding further exposure to benzene, taking proper precautions to minimize or eliminate any risk from such exposure, seeking medical opinions regarding the true state of her medical condition or changing the nature of her job or areas of work, so she would have no contact with benzene.

111. Defendants knew that properly and adequately warning, instructing and training the Plaintiff, her employers, coworkers and the general public of benzene content and capability of causing cancer, leukemia and other blood and bone marrow disorders, including MDS and AML, would be detrimental to their business interests, as such would deter the purchase and use of said products, by the Plaintiff, his employers, coworkers and the general public.

112. Defendants withheld and concealed their knowledge of the releases of benzene on the premises, the concentrations of benzene in the air on the premises, the lack of proper engineering controls to prevent the release of benzene, the failure to properly maintain the process equipment to prevent there release of benzene, of benzene's health hazards, including its ability to cause cancer and fatal blood disease, with the intent, expectation and foreseeability that Plaintiff, her employers and others similarly situated, as well as its customers, would rely upon its statements and omissions in determining whether to work upon its premises and use its benzene-containing products.

113. Despite this knowledge, Defendants did not disclose to the Plaintiff that she would be exposed to benzene or that those benzene exposures would cause her to contract blood disease, aplastic anemia, cancer, leukemia, AML and MDS.

114. Despite all of this knowledge, Defendants willfully and wantonly, through affirmative acts or omissions:

a. Manufactured, produced, processed, marketed, sold and distributed benzene and benzene-containing solvents;

b. Did not eliminate or minimize the benzene content of the identified benzene-containing products;

c. Did not warn, instruct, train and advise the Plaintiff, her employer and coworkers of the occurrence and hazards of their benzene exposures;

d. Did not warn, instruct, train and advise the Plaintiff, her employer and coworkers that they were at grave risk of developing cancer, leukemia and other blood and bone marrow disorders, including AML and MDS from their work on the Wilmington Plant and around benzene and benzene-containing solvents;

e. Did not warn, instruct, train and advise the Plaintiff, her employers and coworkers of the insidious, highly hazardous and deleterious nature of benzene exposure;

f. Did not warn, instruct, train and advise the Plaintiff, her employer and coworkers

that there is no safe level of exposure to benzene;

g. Did not warn, instruct, train and advise the Plaintiff, her employer and coworkers of the necessary and proper personal protective equipment, practices and procedures to minimize or prevent benzene exposure and leukemia risk;

h. Did not affix labels or warnings upon the identified products, their containers or shipping documents that warn, instruct, train and advise the Plaintiff, her employer and coworkers of their cancer and leukemia risk;

i. Did not affix labels or warnings upon the identified products, their containers or shipping documents that warn, instruct, train and advise the Plaintiff, her employer and coworkers that there is no safe level of exposure to benzene;

j. Did not affix labels or warnings upon the identified products, their containers or shipping documents that warn, instruct, train and advise the Plaintiff, her employer and coworkers of the necessary and proper personal protective equipment, practices and procedures to minimize or prevent benzene exposure and leukemia risk:

k. Did not post signs, warnings or other statements upon the Wilmington Plant that warn, instruct, train and advise the Plaintiff, her employers and coworkers of the benzene concentrations in the air, and their cancer and leukemia risk;

l. Did not post signs, warnings or other statements upon the Wilmington Plant that warn, instruct, train and advise the Plaintiff, her employer and coworkers that there is no safe level of exposure to benzene;

m. Did not post signs, warnings or other statements upon the Wilmington Plant that warn, instruct, train and advise the Plaintiff, her employer and coworkers of the necessary and proper personal protective equipment, practices and procedures to minimize or prevent benzene exposure and leukemia risk;

n. Did not train and advise Plaintiff, her employers and coworkers of how to adopt and implement a safe, sufficient and proper plan and method to perform their work at the Wilmington Plant, resulting in the creation of an atmosphere at the Wilmington Plant, that premises and work was relatively safe to be on and to perform;

o. Sacrificed the health and safety of the workers in order to further the Defendants' economic advantage, convenience and profit;

p. Continued to manufacture and sell products containing benzene despite full knowledge that there were safer alternative products; and,

q. Continuing to manufacture and sell products containing benzene despite actually manufacturing and selling products that did not contain benzene which were used for the same purposes as their benzene and benzene-containing solvents and which were equally effective.

r. Defendants committed fraud by withholding information of the health hazards of benzene and the benzene exposures on the Wilmington Plant and by making misrepresentations of material fact to Plaintiff, her coworkers and employer.

s. Plaintiff, his employer and coworkers relied upon the Defendants for information and warnings regarding the health hazards and cancer risk of the benzene and benzene-containing solvents and Wilmington Plant and relied upon the Defendants to manufacture and sell reasonably safe products meeting consumers' expectations of safety.

t. Defendants possessed knowledge and information of the health hazards of benzene, including its ability to cause fatal blood poisoning, cancer, leukemia, DNA damage, chromosome damages, and other damage, disease and cancer to the blood and bone marrow.

u. Defendants withheld and otherwise failed to disclose their knowledge and information of the health hazards of benzene, including its ability to cause fatal blood poisoning, cancer, leukemia, DNA damage, chromosome damages, and other damage, disease and cancer of the blood and bone marrow.

v. Defendants knew that the warnings and information they supplied were untrue, did not believe it to be true, were indifferent as to whether it was true, or because of special circumstances had a duty to know whether the statements were true.

w. Benzene, including the cumulative effects of benzene exposure, is known to cause genetic damage, blood and bone marrow diseases and cancers including AML, MDS, non-Hodgkin's lymphoma, Multiple Myeloma, Chronic Lymphocytic Leukemia, Acute Lymphocytic Leukemia and Aplastic Anemia; and

x. The medical and scientific community recommended that safer solvents be used in place of benzene since as early as the 1920's and the federal government has declared that there is no safe level of exposure to benzene, that products containing benzene are unreasonably dangerous and that no warnings are adequate to protect against the hazards of benzene in consumer products.

115. Defendants' acts and omissions were unreasonable in their character, and made in disregard of a risk known to them or so obvious to them that they must be taken to have been aware

of it, and so great as to make it highly probable that harm would follow.

116. Defendants' acts and omissions demonstrated a conscious indifference to their consequences, namely causing the Plaintiff to contract AML and other injuries identified herein.

117. Defendants intended to cause harmful conduct to the Plaintiff through causing benzene exposure, and did so with the knowledge, belief and intent that such exposure could cause the Plaintiff to contract leukemia.

118. Defendants' intentional conduct in causing the Plaintiff to be exposed to benzene, did in fact cause physical harm to the Plaintiff by directly and proximately causing her to contract AML and other injuries and damages as set forth herein.

119. As the direct and proximate result of the aforesaid willful, deliberate, wanton, knowing, purposeful and intentional acts and omissions, Plaintiff contracted and suffers from AML, and multiple side effects, conditions, illnesses and symptoms caused by AML and the medical treatments necessitated thereby, which cause her pain, suffering, disability, disfigurement, deformity, impairment, mental anguish, anxiety, humiliation, and increased susceptibility to infection.

120. As the direct and proximate result of the aforesaid willful, deliberate, wanton, knowing, purposeful and intentional acts and omissions, Plaintiff was and is prevented from or diminished in her ability to engage in those activities from which she derives life's pleasures.

121. As the direct and proximate result of the aforesaid willful, deliberate, wanton, knowing, purposeful and intentional acts and omissions, Plaintiff has in the past, continues to and in the future will suffer economic losses.

122. As the direct and proximate result of the aforesaid willful, deliberate, wanton,

knowing, purposeful and intentional acts and omissions, Plaintiff was required to, and continues to be required to, spend various sums of money for medical treatments, hospitalizations and medicines, to treat Plaintiff's disease and injuries, and the sequela therefrom, and has incurred additional economic expenses and losses, which expenses and loses may continue to accrue.

123. Wherefore, for all of the foregoing reasons, Plaintiffs pray for judgment from Defendants, individually, jointly and/or severally in an amount in excess of seventy-five thousand dollars ($75,000), together with such other and further relief as this Court deems just and appropriate, under the circumstances, including punitive damages, compensatory damages, costs, interest, and delay damages.

**COUNT V – LOSS OF CONSORTIUM**

124. Plaintiffs hereby adopt and incorporate by reference each and every statement and averment contained in each of the foregoing paragraphs, as if each of said paragraphs were set forth herein with particularity.

125. Plaintiff Roy Brock is, and during all times relevant to his claim was, married to Plaintiff Diane Brock.

126. Due to the wrongful acts and omissions on the part of the Defendants as stated herein, the Roy Brock has suffered the loss of Mrs. Brock's support, society, comfort, love, companionship, friendship, support services and consortium.

127. Wherefore, for all of the foregoing reasons, Plaintiffs pray for judgment from Defendants, individually, jointly and severally in an amount in excess of seventy-five thousand dollars ($75,000), together with such other and further relief as this Court deems just and

appropriate, under the circumstances, including punitive damages, costs, interest, and delay damages.

## **JURY DEMAND**

Plaintiffs respectfully request a trial by jury of any and all claims so triable, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that this Court award and enter judgment as follows:

1. That Plaintiffs be granted a trial by jury;

2. That Plaintiffs recover from Defendants compensatory damages in excess of Seventy-Five Thousand Dollars ($75,000.00);

3. That Plaintiffs recover from Defendants punitive damages;

4. That Plaintiffs recover from Defendants loss of consortium damages.

5. That Plaintiffs recover the costs and expenses incurred in prosecuting this action, all allowable pre-judgment and post-judgment interest as provided by law, and any other allowable costs, expenses and attorneys' fees to the extent provided for by law; and that the Court award such other and further relief as it deems just and proper.

Respectfully submitted this 2nd day of October, 2025.

s/John S. Hughes
John S. Hughes, Esq.
NCSB 17972
Mark Doby, Esq.
NCSB 39637
WALLACE & GRAHAM, P.A.
525 N. Main St.
Salisbury, NC 28144
704-633-5244 Telephone
jhughes@wallacegraham.com
mdoby@wallacegraham.com
*Local Civil Rule 83.1(d) Attorney for Plaintiffs*

Andrew J. DuPont, Esq.*
Locks Law Firm
The Curtis Center
Suite 720 East
601 Walnut Street
Philadelphia, PA 19106
Phone: (215) 893-0100
adupont@lockslaw.com
**to be admitted pro hac vice*
*Attorneys for Plaintiffs*